[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM
The defendants had been the owners of a one-family residence located at 207 Sugar Street, Newtown. It was serviced by a typical septic system consisting of a tank and leaching fields. There was a wet spot on the ground in the vicinity of the leaching fields that could be attributed, at least in part, to surface water run off from an adjacent property at a somewhat higher elevation. In the spring of 1987 they had the tank pumped out by C S Septic Tank Service which reported to them: "Fields running back". In December, 1988 they had the tank pumped again by C S which reported to them: "System in working order at this time, but water level in tank was high and fields were running back due to high water table". In late 1988 they decided to sell the house and move elsewhere. In November, 1988 they listed the property with Tendler real estate agency. Tendler made inquiry of C S about the wet spot and was advised: "In regard to the septic system on 207 Sugar St., it is my recommendation that a curtain drain around the septic area would help to eliminate same of the ground water that is now flooding the leaching area, and would help the system function more efficiently". This recommendation was made on January 30, 1989, and was made known to the defendants. In February, 1989 they observed a dye test of their septic system made in behalf of a prospective purchaser and it failed to reveal any defect in the system. In March, 1989 they moved to their new home.
In April, 1989 they switched their listing of the property to Merrill Lynch Realty. The agreement called for listing of the property with the Newtown Multiple Listing Agency, which was done. An agent of Merrill Lynch stated to them that if the wet spot in the back yard was taken care of, it would make the property more saleable. Accordingly, in April they had C S install a curtain drain and this did appear to solve the problem of surface dampness. Installation of the curtain drain required disturbance of the soil and an agent of Merill Lynch reported that prospective purchasers wanted to know the reason for the work. In response, the defendants' explanation was that it was to divert surface CT Page 9714 water runoff and this information was disseminated to participants in the Multiple Listing Service. No mention was made of the high water table, the high level of water in the tank, the reverse flow of water from the leaching field into the tank, or the flooding of the leaching area, despite the reports in the spring of 1987 and December, 1988 and the recommendation of January 30, 1989.
In late April, 1989 the plaintiffs sought the help of Allen Springmeyer of the real estate firm of Curtis Crandon in finding a new home. That firm participated in the Multiple Listing Service. Springmeyer consulted the listings and as a result showed 207 Sugar Street to the plaintiffs. Relying on the data furnished by Multiple Listing, he told them that the curtain drain was to divert surface water runoff. On May 1, 1989 the plaintiffs executed an offer to purchase which was accepted by the defendants on May 2. Among other provisions this stated: "Acceptable inspection by buyer or buyers agent to be completed prior to signing of contract on May 12, 1989. Buyer requests statement from seller that well has yielded a satisfactory supply of water for the family in the past". The document also listed the broker as Allen Springmeyer — Curtis Condon.
A formal contract bearing no date was subsequently executed by the parties and my recollection of the testimony is that it was signed on May 8. Paragraph 5 of that agreement contains boiler plate language that the Buyers are relying solely on their own inspection, that the sellers and their agents have made no representations, and that the buyers are purchasing the property "as is". In paragraph 14, both sides represented that Curtiss 
Crandon and Merrill Lynch Realty were the procuring cause of the contract. Closing was set for June 9, 1989.
The Director of Health and especially the Senior Sanitarian of Newtown had been involved in the installation of the curtain drain. On May 9, 1989 the Senior Sanitarian wrote a letter to the defendants with respect to the curtain drain. Pertinent parts of this letter:
 1. Soil tests that were conducted on the property indicated that there is in fact a high seasonal water table.
 2. The reported effluent bleedout could result from ground water infiltrating into the leaching fields causing a flooding condition.
 3. Though the installers proposed curtain drain may lower the water table and in fact be of benefit to the CT Page 9715 operation of the system, there can be no guarantee this work will correct the overflow condition. Only by evaluation of the system after installation of the curtain drain, will you know if it lowers the ground water sufficiently to reduce flooding of the system area.
 Because the proposed work can do no harm to the existing system and may in fact be of benefit, the proposal has been approved. However, such work must be undertaken at your own risk. It may or may not be effective in correcting a septic problem, depending on if the licensed installer has correctly evaluated the cause of the failure and can install a drain to effectively lower the water table.
Due to problems with the mails, there was significant delay in the delivery of this letter to the defendants, but it was received well in advance of the closing of sale and was never shown to, or even mentioned to, the plaintiffs.
Title closed on June 2, 1989. The plaintiffs did not move in until the latter part of June. Several weeks after moving in, they noticed a foul odor in the laundry room and shortly this odor spread to bathrooms and plumbing fixtures. By the tag end of August, the odor was such that they deemed the house uninhabitable and moved out. Late in September the tank was uncovered, high water in it was observed, and water was running back into it from the leaching field. In October the plaintiffs had a new system installed at a cost of $12,780. In the course of installation, part of the old leaching field was uncovered and that part was seen to be flooded with water and sewage.
The plaintiffs subsequently sold the premises at a lesser price than they had paid for it. However, the recession in the real estate market at that time is a matter of such general knowledge that I feel justified in taking judicial notice of it so I cannot attribute any loss on resale to the septic system problem.
The defendants admit that on occasion there would be unpleasant odors around the plumbing system but they state this was readily solved by replacing the core of a filtration device in their water system. Remarkably they state that even when there were such odors, the water was perfectly potable. CT Page 9716
I am forced to conclude that the defendants must have known that the septic system had serious problems because of the high water table; that they must have known that the curtain drain was intended not only to divert surface runoff but also to lower the water table but although they affirmatively stated that the purpose was to direct surface runoff, they knowingly concealed the purpose of lowering the water table. The sanitarian's letter of May 9 alerted them to the very real possibility that the curtain drain would not accomplish the latter purpose as the October excavation proved to be the case, and that also was concealed. As the house was empty from the time the defendants moved out in March until the plaintiffs moved in close to the end of June, I can infer that only minimal use was made of the plumbing facilities during that period. It was during that time that the curtain drain was installed so there was no opportunity to observe the results and evaluate the effectiveness of that drain with respect to the water table. As the house was again empty from the tag end of August at least through the time in October when new leaching fields were installed and part of the old field was exposed and flooding was observed, I have to conclude that the Sanitarian's concern that the drain was not effective with respect to the high water table was confirmed. This definitely was a problem that existed during the defendants' ownership and control of the premises.
I conclude that this case is covered by the doctrine set forth in Miller v. Appleby, 183 Conn. 51, 54. The representation that the purpose of the drain was to divert surface water runoff was at best only a half truth and therefore it was a false representation made as a statement of fact. The defendants knew that at best it told only part of the purpose. It was made to induce the plaintiffs to purchase the premises and they did so to their injury. As was said in Egan v. Hudson Nut Products, Inc.,142 Conn. 344, 347, "It is, of course, true that, under certain circumstances there may be as much fraud in a person's silence as in a false statement. . . .To constitute fraud on that ground (mere nondisclosure) there must be a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance which imposes a duty to speak". (Emphasis added) The highly cautionary letter of May 9 certainly qualifies as such an occasion or circumstance. Further, the rule in Franchey v. Hannes, 152 Conn. 372, 379 clearly applies. The defendants "assumed to speak" by stating that the purpose of the curtain drain was to divert surface runoff water. Having made that election, they were required to "make a full and fair disclosure as to matters about which (they) assum(ed) to speak" and reveal the much more important fact that the purpose of the drain was to solve a very real high water table condition, and this they chose not to do. That the plaintiffs had executed a binder giving them the right of inspection and a sales contract with exculpatory CT Page 9717 language such as "as is", "no representations" etc. does not avail the defendants because fraud vitiates all contracts. West v. Anderson, 9 Conn. 106, 37 Am.Jur.2d 526, Fraud And Deceit, 388. Even if we were to disregard the reports as to high water level in the spring of 1987, December 1988 and the recommendation of January 30, 1989, all of which preceded the offer to purchase and the sales contract, the extremely cautionary letter of May 9 would justify the plaintiffs in refusing to close for it was "a fraudulent nondisclosure which causes one to continue in a course of action." Franchey v. Hannes, ibid, 378.
The defendants seek to disclaim any responsibility for representations made by Springmeyer of Curtiss Condon on the claim that he was not their agent. This completely disregards that the listing agreement with Merrill Lynch Realty called for the property to be entered into a Multiple Listing Service in which Curtis Condon participated, that he was named as the broker in the offer to purchase, that both Curtiss Condon and Merrill Lynch were named as procuring causes in the sales contract, and at the closing their lawyer split the sales commission between the two firms from funds from the proceeds of sale and that in this day and age multiple listing and co-broking is the norm in real estate transactions.
I conclude that the plaintiffs have borne their burden by clear and convincing evidence that they were damaged by the fraudulent nondisclosure of a material fact. I am not persuaded, however, that they have demonstrated either negligent infliction of emotional distress, intentional exposure to septic wastes, negligent exposure to septic wastes, creation of a nuisance, or a violation of CUTPA. I attribute their loss on the resale of the house to general real estate market conditions. As they have demonstrated fraud, they may be awarded punitive damages in the form of an attorney's fee and I find a reasonable fee to be one-third of their recover, Brower v. Perkins, 135 Conn. 675.
Judgment may enter for the plaintiffs in the amount of $12,780 compensatory damages and $4,260 punitive damages, costs to be taxed.
J. HEALEY, STATE TRIAL REFEREE.